UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number: 9:16-cv-81491-DMM

SCOTT KEOUGH,

    Plaintiff,

vs.

OXBRIDGE ACADEMY
FOUNDATION, INC.,

    Defendant.

_____/

### Plaintiff's Unopposed Motion for Leave to Supplement First Amended Complaint for Damages and Other Relief

Plaintiff, Scott Keough, moves pursuant to Federal Rules of Civil Procedure 15(d) for leave of court to supplement his pleadings and as grounds shows:

### <u>Introduction</u>

1.    This is a discrimination, retaliation and tortious interference action against Oxbridge Academy Foundation, Inc., a private school that operated in Palm Beach County, Florida, brought by Scott Keough, a former accountant there.  Mr. Keough has sued for interference and retaliation under the Family Medical Leave Act of 1993 and for tortious interference with an advantageous business relationship under Florida common law seeking legal relief, equitable relief, legal fees and costs.

2.      On August 28, 2016, Mr. Keough filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging associational disability discrimination under Titlee I of the Amendicans with Disabilities Act (ADA) against defendant, and on September 30, 2016, the EEOC issued Mr. Keough a Notice of Right to Sue under his claim.

3.      Mr. Keough now seeks leave of court to deem his First Amended Complaint for Damages and Other Relief [DE XX] ("First Amended Complaint") supplemented by the newly ripened disability claim and to deem such new claim properly filed.

### The applicable standards

4.      Federal Rule 15, which governs amended and supplemental pleadings, provides, in pertinent part, that a party may amend its pleading with 21 days after service of a responsive pleading or certain Rule 12 motions.  Fed.R. Civ. Pro. 15(a)(1)(B).  The First Amended Complaint, filed concurrently with this motion, has been filed as a matter of course within 21 days, plus the time allowed under Rule 6(d), from the service of defendant's motion to dismiss.  The First Amended Complaint contains the not-yet-authorized supplemental claim for associational disability discrimination under the ADA that ripened only after this action was commenced by the filing of the Complaint for Damages — Jury Trial Demanded [DE 1].  A copy of the First Amended Complaint for Damages and Other Relief is appended as Exhibit A.

5.      Rule 15(d), which governs supplemental pleadings, further provides that:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.  The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

The Notes of the Advisory Committee on Rules noted in regard to a 1963 amendment to the Rule,

> Rule 15(d) is intended to give the court broad discretion in allowing a supplemental pleading. . . .

> Under the amendment the court has discretion to permit a supplemental pleading despite the fact that the original pleading is defective. As in other situations where a supplemental pleading is offered, the court is to determine in the light of the particular circumstances whether filing should be permitted, and if so, upon what terms.

        6.      Mr. Keough's disability discrimination claim presents additional grounds for relief which he could not assert until administrative remedies had been exhausted, i.e., until his claim had been dismissed by the EEOC, and a denial of leave of court to supplement his complaint with it will cause him undue prejudice because he will suffer the loss of his federal disability claim.

        7.      This motion is filed in good faith and not for the purposes of delay.  Mr. Keough first placed defendant and this Court on notice that he would be seeking to supplement his complaint with the associational disability claim on September 23, 2016 and September 26, 2016, respectively.  The Court on September 27, 2016 granted plaintiff until November 12, 2016 within which to amend to assert his ADA claim, so this motion is timely.  No party will be prejudiced, the progress of this case will

not be affected and the court's schedule will not be disrupted because the case is still only in its initial pleading stages.

WHEREFORE, plaintiff, Scott Keough, moves for entry of an order granting this motion and deeming the ADA associational disability claim set forth in the First Amended Complaint as timely and properly filed; and granting plaintiff such other and further relief as is just.

## Certificate of Conferral

I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief in the motion in a good faith effort to resolve the issues raised in the motion. Counsel for defendant has stated defendant does not object to the requested relief.

Respectfully Submitted,

/s/ Isha Kochhar
KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
WILLIAM ROBERT AMLONG
Florida Bar Number 470224
WRAmlong@TheAmlongFirm.com
ISHA KOCHHAR
Florida Bar Number 105294
IKochhar@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301
(954) 462-1983 (Telephone)
(954) 523-3192 (Facsimile)

**Attorneys for the Plaintiff,
Scott Keough**

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been submitted electronically through the CM/ECF System this 20th day of October, 2016 and thereby served on all counsel or parties of record on the Service List below.

## Service List

WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275564
KAmlong@TheAmlongFirm.com
ISHA KOCHHAR
Florida Bar No.: 105294
Ikochhar@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street,
Second Floor
Fort Lauderdale, Florida 33301
(954) 462-1983

***Attorneys for Plaintiff***

BARRY POSTMAN
Florida Bar No.: 991856
barry.postman@csklegal.com
NICOLE WALL
Florida Bar No.: 17430
nicole.wall@csklegal.com

COLE, SCOTT & KISSANE, P.A.
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone: (561) 383-9200

***Attorneys for Defendant***

\\amlong3\cpshare\CPWin\HISTORY\160909_0001\154F.39

UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF FLORIDA

West Palm Beach Division

Case No. 9:16-cv-81491-DMM

SCOTT KEOUGH,

      Plaintiff,

vs.

OXBRIDGE ACADEMY
FOUNDATION, INC.,

      Defendant.

_____/

### First Amended Complaint for Damages — Jury Trial Demanded

      Plaintiff, Scott Keough, sues defendant, Oxbridge Academy Foundation, Inc., and as grounds shows:

### Introduction

      1.    This is a discrimination, retaliation and tortious interference action against Oxbridge Academy Foundation, Inc. ("Oxbridge" or "defendant"), a private school that operated in Palm Beach County, Florida, by brought by Scott Keough ("Keough" or "plaintiff"), a former accountant there who took FMLA leave to care for his bed-ridden pregnant wife and hearing and developmentally impaired six-year old son, during which leave Oxbridge personnel repeatedly contacted Keough concerning work-related



**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL 33301 ● 954.462.1983

**EXHIBIT A**

issues and his planned date of return.  Oxbridge replaced Keough and fired him before his FMLA leave was exhausted and even though Keough had planned to return to work.  Oxbridge claimed Keough had resigned, despite his insistence he had not.   Later, Oxbridge refused to provide Keough with a promised job reference, preventing him from receiving a formal offer of a "dream job" for which he was qualified and which had been conditionally offered to him contingent only upon the positive reference from his former employer.

Plaintiff sues for interference and retaliation under the Family Medical Leave Act of 1993 ("FMLA"), for discrimination under Title I of the Americans with Disabilities Act of 1990 ("ADA"), and for tortious interference with an advantageous business relationship under Florida common law.  He seeks all available legal and equitable relief, as well as his costs, including a reasonable attorneys' fee, if he prevails on one or all of his FMLA or ADA claims.

## Jurisdiction, Parties and Venue

2.     This is an action arising under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. and Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq. This court is vested with original jurisdiction under 28 U.S.C. § 1331.  The court has jurisdiction to grant declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.  The court has

supplemental jurisdiction of the common law state claim under 28 U.S.C. § 1367.

     3.    Venue is proper in the Southern District of Florida, West Palm Beach Division, under to 28 U.S.C. § 1391(b)(1) and (2) because the events and omissions giving rise to the claims occurred in Palm Beach County, Florida, where plaintiff was employed.

     4.    Plaintiff, Scott Keough, at all times material was:

        a.    an revenue accountant, and later accountant, employed with Oxbridge;

        b.    an "eligible employee" with respect to FMLA leave as defined in 29 U.S.C. § 2611(2)(a);

        c.    in need of FMLA leave to care for his spouse, who had a serious health condition as contemplated by 29 U.S.C. § 2612(a)(1)(C), 29 U.S.C. 2611(11) and 29 C.F.R. § 825.114(a)(2)(I).

        d.    protected by 29 U.S.C. § 2615  because he exercised his right to take FLMA leave.

        e.    an "employee" and "qualified individual" with respect to the ADA as defined in § 42 U.S.C. §§ 12111(4) and 12111(8), respectively.

        f.    the spouse of a woman and father to a son, each having a "disability" as contemplated by 42 U.S.C. § 12102.

g.      protected by 42 U.S.C. § 12112 which forbids discrimination against a qualified individual on the basis of disability in regard to the terms, conditions and privileges of employment.

5.      Defendant, Oxbridge Academy Foundation, Inc.  is and was at all material times  an "employer" as envisioned by 29 U.S.C. § 2611 (4) and 42 U.S.C. § 12111(5).

## Satisfaction of Conditions Precedent

6.      Keough, on or about August 1, 2016, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR"), alleging discrimination on the basis of associational disability discrimination.

7.      The EEOC, on or about September 30, 2016, issued Keough a Dismissal and Notice of Rights on his discrimination claims, within 90 days of his receipt of which he is filing this action.

8.      Any other conditions precedent to the bringing of this action have been satisfied and/or waived.

## General Allegations

9.      On or about September 2013, Keough began to work for Oxbridge as a revenue accountant and, later, was promoted to accountant, positions for which he was qualified.  During his employment, he never received low performance ratings and or any performance counseling.

10.     Keough's wife, Johana Keough, in December 2008, gave birth to a son, Ethan, who was born at 21 weeks gestational age and lived only a few hours.

11.     Johana Keough became pregnant again, and in December 2009 gave birth to Jason at a gestational age of 26 weeks.  Scott and Johana Keough spent every night at the hospital where Jason remained for three months until he could be sent home.   As a result of his pre-term birth, Jason is completely deaf in one ear and partially deaf in the other, suffers from minor speech deficits and is delayed in his social development.

12.     Beginning January 2015, Keough came under the direct supervision of Rebecca De Jesus, Comptroller for Oxbridge, although he also reported to John Weger, Oxbridge's Chief Financial Officer, and to Robert Parsons, its Chief Executive Officer.

13.     On or about January 20, 2016, Keough's again-pregnant wife, who by this time had been diagnosed as having an incompetent cervix, underwent cervical cerclage, a procedure in which her cervix was stitched shut to try to prevent premature delivery of the child she was carrying. Johana Keough was ordered to strict bed rest by her obstetrician for the duration of her pregnancy, which was considered high risk because of her two earlier premature births.  As a result of being placed on bed-rest for the duration of her pregnancy, Johana Keough was unable to care for Jason

without near full-time assistance or to transport herself to her doctors as needed for her ongoing medical treatment.

14.     Upon learning of his wife's serious medical condition and her attendant needs, and as provided for in Oxbridge's Employee Handbook regarding FMLA Notice and Medical Certification, on January 20, 2016, Keough informed Nace-Perez and Weger that he would need to take time off from work to care for his wife and child and requested all necessary information to secure FMLA leave.

15.     Nace-Perez, on or about January 22, 2016, sent Keough two forms — an FMLA Notice of Eligibility and Rights and Responsibilities and an FMLA Certification of Health Care Provider for Family Members' Serious Health Condition, which she instructed Keough to complete and submit by February 6, 2016 to qualify for FMLA benefits.

16.      The Notice of Eligibility and Rights and Responsibilities:

a.     did not designate Keough as a "key employee" as defined in the FMLA whose restoration to employment could be denied following FMLA leave on the grounds that such restoration would cause Oxbridge substantial and grievous economic injury; and

b.     instructed that while on leave Keough would be required to furnish Oxbridge with periodic reports of his status and intent to return to work every 30 days.

17.     Keough returned copies of the executed FMLA forms to Nace-Perez on or about January 29, 2016 and later mailed the originals to her at her request.

18.     Keough, on February 1, 2016, in response to an inquiry from Nace-Perez about the expected end date of his FMLA leave, advised her that he was unsure how long he would be out, but intended to return within the 12 week period.  Nace-Perez replied, reminding him to keep her updated every 30 days.

19.     The following day, February 2, 2016, Nace-Perez emailed Keough saying, "[I]n trying to determine the workload here, will you give an approximate date of your return?  I understand this date is not a hard date, but an estimated date allows for Oxbridge to plan accordingly."

20.     Nace-Perez, on or about February 4, 2016, sent Keough his FMLA designation notice.

21.     Keough, feeling pressured to return lest he lose his job, on February 8, 2016, notified Nace-Perez he planned to take FMLA leave continuously until February 29, 2016, but would return thereafter and only take leave intermittently as required to take his wife to doctors' appointments and otherwise attend to her care.  Keough advised DeJesus and Nace-Perez that his wife could make do without him there while Jason was in school, but that he would need to leave at 2 pm, pick up his son and take him home, and then return to work for two more hours, leaving Jason

to watch TV and entertain himself, hopefully allowing his mother to remain in bed.

22.     On the Friday prior to Keough's planned return date, Nace-Perez emailed him that upon his return, he needed to meet with Lisa Rojas, Assistant Controller, to review work left undone by his temporary replacement.

23.     Keough returned to work as agreed on February 29, 2016. Shortly after his arrival that morning, DeJesus and Rojas met with Keough to discuss "goals" and how these "goals" would affect his annual review in July. That same morning, Keough received a call from his wife that she was bleeding and had been directed by her high-risk obstetrician to immediately go to the emergency room.  At the hospital, Johana Keough tested positive on a fetal fibronectin test, indicating a high probability that pre-term labor was imminent.  She was admitted to the hospital, where her doctor told her she would have to remain through her due date, July 3.

24.     Keough immediately notified Oxbridge of the developments relating to his wife's pregnancy and left the workplace for the hospital, resuming continuous FMLA leave.  No paperwork terminating the continuous leave and commencing intermittent leave ever were prepared or submitted because Keough was back in the office only a few hours.

25.     Upon Keough leaving again on continuous FMLA leave, his work email, which had been activated in anticipation of his return, remained

activated and over the next several days, Scott received work-related emails.

26.     DeJesus, on March 4, 2016, requested Keough to come to Oxbridge on March 7 or March 8 for an early morning meeting "for an hour and a half tops," thus acknowledging her understanding that Keough was still on continuous FMLA leave.  DeJesus advised Keough that the purpose of the meeting was to discuss the "stories" of parents who still owed the school money prior to sending out new financial aid contracts, which Keough felt DeJesus was pressuring him to get out earlier than in prior years.  DeJesus told Keough that CEO Parsons, who would also be in attendance at the meeting, had requested his presence.

27.     Keough appeared for the meeting as requested and remained in the office for four hours.  While Keough was at the school for the meeting, Parsons directed him to take phone calls and answer e-mails from the delinquent parents, as needed, to settle the accounts receivables issues discussed at the meeting.

28.     When Keough informed Parsons that he was out on FMLA leave caring for his wife and child and was not able to come into the office to answer phone calls and e-mails, Parsons proposed that Keough work remotely while on FLMA leave to care for his wife and son, and that Parsons would "figure out something that is fair" to compensate Keough for his time.

29.     Keough verbally accepted Parsons' proposal to work remotely, which he confirmed in a March 7 email to DeJesus, and began responding to emails while "on" FMLA leave. Parsons, however, never "figure[d] out something that is fair" to compensate Keough for his time and Oxbridge never paid Keough for the time he worked during FMLA leave or credited that time toward Keough's twelve work week entitlement.

30.     At the March 7 meeting, Keough also notified Parsons, De Jesus and Rojas that he expected to be offered another job as a deputy sheriff trainee in the Jefferson County Sheriff's Department in Golden Colorado, a position for which he had applied in December 2015.  Keough told the Oxbridge leaders that he would remain with Oxbridge until July 1.  Parsons congratulated Keough on achieving this opportunity and, at Keough's request, promised Keough positive job references.

31.     Later in the day on March 7, 2016, although Dejesus had requested Keough to come to a meeting "for an hour and a half tops," after Keough had returned to the facility where his wife was hospitalized, DeJesus emailed him, "And though we appreciate you coming in today, Melissa or I did not know you weren't going to be staying all day."  Keough pointed out that he was out on FMLA leave, to which DeJesus responded, "Regardless, the terms of your FMLA leave were relayed to you from Melissa, which still require updating on a daily basis unless you are expecting to be out for a longer stretch, for which again, we still need to be advised."  Keough then

replied that due to his wife's hospitalization, he was not able to commit to coming in daily and renewed his offer to work remotely.

32. In response to Keough's offer to work remotely, Rebecca DeJesus told plaintiff,

> I have discussed that with Bob [Parsons], and unfortunately due to your position, I do not see that as currently possible due to technological restraints, however we will get back to you on that. Please do not begin working from home until I let you know what we have determined.

33. The "technological restraints" to which DeJesus referred was the need to have a laptop at home with which to work. When plaintiff first started, all the accountants had desktops, but under CFO John Weger, they were given laptops and routinely took them home to work. No additional technology was required. Plaintiff had left his laptop at work when he went on FMLA leave, but easily could have retrieved it.

34. Additionally, a number of employees frequently worked remotely including two female employees with young children or infants.

35. On the same day as she told Keough "technological restraints" likely would preclude him working remotely, DeJesus texted Keough on his personal phone, "Check email" and on March 8, 2016, she emailed him to "use memorized transactions for Gatorade."

36. Although Keough returned to continuous FMLA leave at the time of his wife's hospitalization on February 29, necessitating a status report only every 30 days according to the Notice of Entitlement and Rights and

Responsibilities he had received at the commencement of his leave, Nace-Perez chided Keough on March 8 for failing to "follow protocol" and "update me and Rebecca *daily*" whether he would be at work the next day "so we can staff accordingly."  Keough, on March 9, responded that although the *plan* was for him to return on February 29 and use intermittent leave thereafter, his wife's condition required that he sleep in the hospital on a cot until she had a "more stable prognosis" because her medical condition was "moment to moment."  He pointed out that notwithstanding being on FMLA leave, he would continue answering emails remotely as he had been doing for the past several days and as DeJesus's message to "Check email" appeared to direct him to do.

37.    DeJesus, on March 10, sent an email to several people including Keough and Parsons voicing concern about resolving the collection issues with the delinquent parents so that financial aid and re-enrollment contracts could go out.  In response to DeJesus's concerns, Keough emailed Parsons reiterating that he was available to assist remotely if supplied with an up-to-date accounts receivable aging.  Parsons responded that  he, DeJesus and Nace-Perez wanted to "respect" Keough's "situation" and not "make demands that may conflict with your support of your family" and had decided to reassign the work he had been doing to another staff member.

38.    Nace-Perez, on March 14, 2016, sent Keough an email to his personal email address stating that although Keough had told Parsons during

the March 7 meeting that he intended to resign (effective July 1), she wanted a written resignation.  Keough was still on FMLA leave.

39.    Keough responded that he would provide his written resignation effective July 1, 2016, under separate cover and inquired as to the status of professional references to Jefferson County.  Nace-Perez replied that she had not received any request for employment verification and was unaware whether Jefferson County had contacted any other Oxbridge employee.

40.    Keough began inquiring of Nace-Perez on or about April 6 about his rights once his FMLA leave time was exhausted, and if he must resign if he could not return to work.

41.    Nace-Perez responded on April 8, 2016, that Oxbridge anticipated that upon Keough's return, he would work through the effective date of his resignation.  She also thanked Keough for the advance notice he had given of his intent to leave, which enabled Oxbridge to find a replacement for him.  Finally, Nace-Perez affirmed that Keough would have the opportunity to work with his replacement until the end of June, but if he could not return "***before [his] resignation***" (emphasis added) Oxbridge would "consider the next option."

42.    Keough notified Nace-Perez on April 11 that because his wife remained in the hospital and he would have to be the sole caregiver for his son, and would not be able to return to work full time upon the expiration of his FMLA leave, but could return to work while his son was in school from

8:30 am to 2:00 pm, as he had proposed to do upon his return February 29, with the intention that he would spend the remaining portion of his workday working remotely as Parsons had suggested he do during the March 7 meeting and as the work-related email exchanges evidenced Keough had been doing.  Keough did not expressly mention working remotely, but did say, "in order for me to return, I would need Oxbridge to compensate me as a salary employee with a full 80 hour paycheck every 2 weeks.  I would also need some assurance that I would be employed through the end of June." Keough did not mean that he expected to be paid a full time salary for part time work, but rather that he expected to be paid for working remotely on the same basis as working in the office because Parsons had not made good on his promise to "figure out something that is fair" for the work he had done between February 29 and March 10.

43.    The following day, without personally speaking with Keough to clarify her "understanding" of what Keough intended in his email, Nace-Perez wrote, "Per your comment below, Oxbridge is not in a position to pay you for hours not worked, and as a result, we understand that you will not return upon expiration of your FMLA leave. Oxbridge accepts your resignation upon the expiration of your leave, April 21, 2016."

44.    Keough responded on April 14, clarifying he never indicated he was resigning April 21, 2016, but that he was "reaching out" to come to an agreement on the transition to the next accountant and how it related to his

work schedule and compensation.  Neither Nace-Perez, nor any other employee of defendant, ever acknowledged or responded to the email.

45.    The following day, April 15, 2016, Johana Keough gave birth to a son, Joseph, at 28 gestational weeks via cesarean section.  Shortly after giving birth to Joseph, Johana Keough began to experience loss of vision as a result of inflammation of her optic nerve due to the steroids she had taken during her pregnancy to strengthen the lungs of her unborn child, which was expected to be born prematurely.  Johana Keough now is legally blind. Joseph suffered a grade 3 brain bleed on one side of his brain and a grade 1 brain bleed on the other, the effects of which, if any, have not yet been determined.  Joseph remained in the neonatal intensive care unit for forty-five days; his parents visited him daily.

46.    Joseph's birth changed everything: although the Keough family still faced challenges, Keough could have returned to work even prior to the expiration of his FMLA leave after his son was born with accommodations similar to those afforded other employees including Nace Perez who left work every afternoon to pick up her daughter from school and drive her home and them return to work, the two female employees with young children or infants who regularly worked at home and another employee who brought her toddler to the workplace three or four days a week for a few hours at a time.

47.     Oxbridge, on April 19, 2016, hours short of Keough's FMLA leave expiring, announced Joanne Labarca would replace Keough, effective immediately.

48.     Upon receiving notification he had been replaced by Labarca, Keough emailed Parsons, "looking for someone who will listen."  He asserted that he had been forced out of his position because he had taken FMLA leave and replaced while still on leave and had not even received the detailed reference Parsons had promised, which has cost him the opportunity with the Jefferson County Sheriff's Department.  Keough accused management of being  "vindictive" and treating him "unfairly" despite his giving "100%" during his employment.

49.     Parsons responded April 20, telling Keough Oxbridge had permanently replaced Keough when Keough "advised" Nace-Perez  — which he never did —  that he would "only" return to Oxbridge for part-time work, but with full-time pay, "effectively resigning," as of that date.

50.     Parsons also denied he had ever promised Keough positive professional references, and claimed it was Oxbridge policy only to provide employment dates and title to prospective employers.

51.     Keough immediately responded, denying he ever had tendered an immediate resignation, as opposed to one effective July 1, 2016, and stating that he had been attempting — albeit unsuccessfully — to negotiate a modified work schedule and compensation adjustment, which neither

equated to a resignation nor comprised an "unusual" request "[e]specially considering working remotely was your idea."

52.     During the same communication, Keough also challenged Parson's we-don't-give-references comments, reminding Parsons Oxbridge recently had done just that for a former employee, Robert Diehl, for whom Oxbridge provided full professional references upon informal request for Mr. Diehl's application to the Jefferson County Sheriff's Department — the same agency to which Keough had applied.

53.     Keough's email to Parson's also went unanswered, and on April 21, 2016, Nace-Perez emailed Keough a Severance Agreement and Release of Claims, which offered to pay Keough $1,700, less withholding taxes, if he released all claims against Oxbridge.  Keough did not accept the money or sign the release.

### Count I: Willful Interference with Plaintiff's FMLA rights

54.     Keough hereby realleges the allegations set forth in paragraphs 1 through 3, 4(a) through 4(d), 5, and 9 through 53 as if fully set forth herein.

55.     Oxbridge willfully and intentionally violated the anti-interference provisions of § 105(a) of the Family Medical Leave Act of 1993, 29 U.S.C. § 2615(a)(1) and interfered with Keough's substantive rights under the FMLA, by:

      a.    demanding that Keough perform job duties — including attending a meeting and responding to phone calls and emails —  without either compensation or credit toward his twelve work-week entitlement while Keough was on FMLA leave; and

      b.    failing to restore Keough to the position he held when the leave commenced or an equivalent position as required by 29 U.S.C. § 2614(a)(1) through the effective date of his proffered resignation: July 1, 2016.

56.    As a direct, natural and proximate result of Oxbridge's willful interference with Keough's rights under the FMLA, he has suffered damages.

57.    Keough is entitled to liquidated damages unless Oxbridge proves it acted in good faith in interfering with Keough's FMLA rights.

58.    Keough is entitled to recover his reasonable attorney's fees and litigation expenses pursuant to 29 U.S.C. § 2617.

WHEREFORE, Plaintiff, Scott Keough, respectfully requests this Court to enter judgment for him and against defendant, Oxbridge Academy Foundation, Inc.:

      a.    **One**, determining and declaring that Oxbridge's willful interference with Keough's FMLA rights was in violation of Keough's rights under the Family Medical Leave Act of 1993;

b.   **Two,** granting judgment against Oxbridge for damages, including but not limited to lost wages and back pay; payment for lost benefits; pre-judgment interest; and liquidated damages;

c.   **Three**, awarding Keough his attorneys' fees and litigation expenses; and

d.   **Four**, granting such other and further relief as is just.

### Count II: Retaliation in Violation of the FMLA

59.   Keough hereby realleges the allegations set forth in paragraphs 1 through 3, 4(a)-4(d), 5, 9 through 53 and 72 through 83 as if fully set forth herein.

60.   Oxbridge, motivated by retaliatory animus because of Keough's exercise of his right to FMLA leave, willfully and intentionally violated the anti-retaliation provisions of § 105(a) of the Family Medical Leave Act of 1993, 29 U.S.C. § 26154(a)(1) and (2) and/or the Department of Labor's anti-retaliation regulation, 29 C.F.R. § 825.220(b), by:

a.   terminating Keough from employment prior to the expiration of his FMLA leave; and

b.   refusing to provide Keough with a detailed personal reference although it provided such references to individuals who did not avail themselves of FMLA's benefits.

61.   As a direct, natural and proximate result of defendant's intentional retaliation because of Keough's exercise of his rights under the

FMLA, Keough has suffered damages, including, but not limited to lost wages and benefits and the monetary losses attendant to loss of the Jefferson County job.

62.   Keough is entitled to liquidated damages unless Oxbridge proves it acted in good faith with regard to Keough's termination and Oxbridge's refusal to provide a detailed personal reference.

63.   Keough is entitled to reasonable attorneys' fees and costs and expenses of this action pursuant to 29 U.S.C. § 2617(a)(3).

WHEREFORE, plaintiff, Scott Keough, respectfully requests this Court to enter judgment for him and against defendant, Oxbridge Academy Foundation, Inc.:

a.   **One**, determining and declaring that Oxbridge's termination of Keough was in violation of Keough's rights under the Family Medical Leave Act of 1993;

b.   **Two,** determining that Oxbridge's refusal to provide Keough with a detailed reference in connection with the Jefferson County job was in violation of Keough's rights under the Family Medical Leave Act of 1993;

c.   ***Three***, granting judgment against Oxbridge for damages, including but not limited to lost wages, lost employment benefits, including back pay and front pay; other monetary losses in connection with loss of the Jefferson County Job; pre-judgment interest; and liquidated damages;

      d.   **Four**, awarding Keough his attorneys' fees and litigation expenses; and

      e.   **Five**, granting such other and further relief as is just.

### Count III: Relationship or Associational Discrimination Under Title I of the ADA

64.    Keough hereby realleges the allegations set forth in paragraphs 1 through 3, 4(a), 4(f), 4(g) and 5 through 53 as if fully set forth herein.

65.    The ADA defines "discriminate" to include, among other factors, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. 12112(b)(4).

66.    Oxbridge terminated Keough when it did because it knew of the disability of his wife and his sons and knew from experience that at times, Keough had to be their caregiver and that this would result in instances when Keough would be unable to work at the office, although he would still be able to work from home as other employees were allowed to do.

67.    Because there was no legitimate, performance-related reason to terminate Keough, Oxbridge terminated him based on his association with his wife and sons.

68.    Keough's termination was, therefore, in violation of the anti-discrimination provisions of Title I of the ADA.

69.     As a direct, natural and proximate result of Oxbridge's wrongful termination of Keough, Keough has suffered damages.

70.     Keough is entitled to reasonable attorneys' fees and costs and expenses of this action pursuant to 42 U.S.C. § 12133.

WHEREFORE, plaintiff, Scott Keough, respectfully requests this Court to enter judgment for him and against defendant, Oxbridge Academy Foundation, Inc.:

a.     **One**, determining and declaring that Oxbridge's termination of Keough was in violation of Keough's rights under the Americans with Disabilities Act;

b.     ***Two***, granting judgment against Oxbridge for damages, including but not limited to lost wages, lost employment benefits, including back pay and front pay; pre-judgment interest; and liquidated damages;

c.     **Four**, awarding Keough his attorneys' fees and litigation expenses; and

d.     **Five**, granting such other and further relief as is just.

### Count IV: Tortious Interference

71.     Keough hereby realleges the allegations set forth in paragraphs 1 through 4.a, 9, 14 through 17, 20, 23, 24, 30, 38, 39 and 50(b) as if fully set forth herein.

72.     In December 2015, Keough applied for a deputy sheriff position with the Colorado-based Jefferson County Sheriff's Office ("Jefferson

County").   The Jefferson County position was Keough's "dream job," not only because is  because it not only paid more than Keough's job at Oxbridge, allowing Johana Keough to be a stay-at-home mom with her two special needs children rather than putting them in day care while she worked, but it also would lead to Scott becoming a forensic accountant for a law enforcement agency.

73.    Out of state applicants for the Jefferson County position would be required to make at least two trips to Colorado for interviews and testing and, to eliminate applicants lacking the proper qualifications or whose personal history contained some disqualifying incident, Keough was required to complete and submit a personal history questionnaire containing over 800 questions, which he did.

74.    Jefferson County informed Keough on January 11, 2016 that he had been selected to continue the hiring process and he was scheduled to travel to Colorado for written testing on February 22, 2016.

75.    Keough's success in the application process continued and on March 3, 2016, Jefferson County advised Keough that he had been selected for the next phase of the hiring process, which included the submission of specified documents, the completion and submission of a ten-year employment history and, most importantly, detailed personal references. The Jefferson County recruiter cautioned, that if any of his supervisors were

unaware that he was seeking with Jefferson County to tell them so that they could complete the required detailed references.

76.    As instructed by the Jefferson County recruiter, Keough told the individuals in attendance at the March 7, 2016 meeting that he was applying for another job, that he expected to be hired and that he needed their positive references, which CEO Parsons assured him he would receive.

77.    Keough, by March 22, had provided Jefferson County with his employment history form and all the required documents except a copy of his high school diploma, which later was provided.

78.    Keough continued to move positively through the Jefferson County application process and by April 1, 2016,  Jefferson County had scheduled him for a presentation before command staff the following month, after which it expected to extend conditional job offers to successful candidates.   The recruiter noted that one of his proposed and required references, his direct supervisor, Controller DeJesus, was out on maternity leave, and requested an alternate reference.  Keough suggested Nace-Perez, with whom he had worked closely for over a year.

79.    Keough, by April 14, 2016,  had submitted all required paperwork to Jefferson County to secure a deputy sheriff  position.

80.    The Jefferson County recruiter advised Keough on April 14, 2016, that Oxbridge had not cooperated in providing references including, but not only, Nace-Perez who responded to the employment reference

request by confirming Keough's employment dates, but failing to answer any specific questions regarding Keough's employment.  The recruiter noted that absent a reference from a current supervisor, Jefferson County could not offer him a position.

81.     No further reference was forthcoming from Oxbridge.

82.     The Jefferson County recruiter notified Keough on May 18, 2016, that the selection process for a deputy sheriff with the Jefferson County Sheriff's Office had been completed and he was not selected.

83.     At all material times Keough had a valid business relationship and expectancy with Jefferson County Sheriff's Office for the position of deputy sheriff.   More particularly, there existed an understanding between Keough and Jefferson County Sheriff's Office that the County would hire Keough contingent only upon the positive reference from his current employer, which understanding would have been completed had the Oxbridge not interfered.

84.     At all material times, Oxbridge and its agents were aware of the business relationship and expectancy Keough maintained with Jefferson County Sheriff's Office regarding the position of deputy sheriff.

85.     Oxbridge, through its agents acting within the course and scope of their employment, intentionally and unjustifiably interfered with Keough's business relationship and expectancy with Jefferson County's Sheriff's Office by failing to provide detailed employment references for Keough.

86.    As a direct, natural and proximate results of Oxbridge's failure to provide detailed employment references to Jefferson County Sheriff's Office, Keough has suffered damages, including but not limited to lost wages, loss of earning capacity, and mental anguish.

87.    Oxbridge, through its agents including its CEO and other highly placed officers and employees, was guilty of intentional misconduct which was a substantial cause of damage to Keough so as to warrant punitive damages against Oxbridge.  Particularly, either:

a.    Oxbridge is directly liable for punitive damages because one or more Oxbridge's managing agents were personally guilty of intentional misconduct, because they had actual knowledge the Jefferson County Sheriff's Department required positive, detailed personal references from Keough's supervisor at Oxbridge in order for Keough to be unconditionally offered a position and that a high probability existed that the failure of Oxbridge to provide such positive, detailed personal references would cause Keough to lose the opportunity he had conditionally achieved to be a deputy sheriff, but nonetheless — for a purely malicious motive — refused to give, or authorize anyone else to give, Keough anything but a title-and-dates-of-employment-verification, resulting in Jefferson County's refusal to hire Keough; or

b.    Oxbridge is vicariously liable for punitive damages because one or more officers, directors or managers of Oxbridge knowingly

condoned, ratified or consented to Oxbridge employees not responding to requests for a detailed personal reference and/or refusing to provide anything but a title-and-dates-of-employment-verification for Keough, knowing that the deficit in the detailed personal references required likely would doom Keough's chances of being hired.

WHEREFORE, plaintiff, Scott Keough, respectfully requests this Court to enter judgment for him and against defendant, Oxbridge Academy Foundation, Inc., for damages, including punitive damages, costs and such other and further relief as is just.

### Plaintiff's Jury Demand

Plaintiff, Scott Keough, demands trial by jury on all issues so triable.

Respectfully Submitted,

*/s/* Karen Coolman Amlong
KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
WILLIAM ROBERT AMLONG
Florida Bar Number 470224
WRAmlong@TheAmlongFirm.com
ISHA KOCHHAR
Florida Bar Number 105294
IKochhar@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301
(954) 462-1983 (Telephone)
(954) 523-3192 (Facsimile)

**Attorneys for the Plaintiff,
Scott Keough**

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been submitted electronically through the CM/ECF System this 20th day of October, 2016 and thereby served on all counsel or parties of record on the Service List below.

## Service List

WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275564
KAmlong@TheAmlongFirm.com
ISHA KOCHHAR
Florida Bar No.: 105294
Ikochhar@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street,
Second Floor
Fort Lauderdale, Florida 33301
(954) 462-1983

***Attorneys for Plaintiff***

BARRY POSTMAN
Florida Bar No.: 991856
barry.postman@csklegal.com
NICOLE WALL
Florida Bar No.: 17430
nicole.wall@csklegal.com

COLE, SCOTT & KISSANE, P.A.
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone: (561) 383-9200

***Attorneys for Defendant***

\\amlong3\cpshare\CPWin\HISTORY\160909_0001\154F.30