## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-81491-CIV-MIDDLEBROOKS

SCOTT KEOUGH,

      Plaintiff,

v.

OXBRIDGE ACADEMY
FOUNDATION, INC.,

      Defendant.

_____/

## ORDER AND OPINION DENYING DEFENDANT OXBRIDGE ACADEMY FOUNDATION, INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

THIS CAUSE comes before the Court upon Defendant Oxbridge Academy Foundation, Inc.'s ("Oxbridge") Motion to Dismiss Plaintiff's Amended Complaint ("Motion"), filed on November 14, 2016. (DE 28). Plaintiff Scott Keough ("Keough") filed a Response in opposition on December 19, 2016 (DE 34), to which Defendant replied on January 6, 2017 (DE 39). For the reasons stated below, the Motion is denied.

## BACKGROUND

Beginning in 2013, Keough was a revenue accountant – later promoted to a title styled simply "accountant" – at Oxbridge, a private school in Palm Beach County, Florida. (Amended Complaint (DE 22), hereinafter "Complaint" or "Compl.," at ¶¶ 1, 9). On January 20, 2016, Keough's pregnant wife, Johana, underwent a surgery to prevent her from delivering birth prematurely. (*Id.* at ¶ 13). As a consequence of the surgery, Johana was required to remain on bed-rest "for the duration of her pregnancy." (*Id.*). That condition made it impossible, without "full-time assistance," for her to transport herself to doctors for appointments or to care for her

and Keough's young son. (*Id.*). Because of these circumstances, Keough informed John Weger ("Weger"), Oxbridge's Chief Financial Officer, and Melissa Nace-Perez ("Nace-Perez"), its Director of Human Resources, that same day that he needed "time off from work to care for his wife and child." (*Id.* at ¶ 14). On January 22, 2016, Nace-Perez sent Keough forms to complete to determine whether he would qualify for leave under the Family and Medical Leave Act of 1993 ("FMLA") (*id.* at ¶ 15), which he returned on January 29 (*id.* at ¶ 17). On February 4, 2016, Nace-Perez sent Keough a notice indicating that Oxbridge had designated him for FMLA leave. (*Id.* at ¶ 20).

On two occasions in early February, Nace-Perez inquired of Keough when he expected to return from FMLA leave. (*Id.* at ¶¶ 18-19). Keough, "feeling pressured to return" soon so as not to jeopardize his job, replied on February 8, 2016 that he planned to take leave "continuously" until February 29, 2016 and would take leave "intermittently as required" thereafter. (*Id.* at ¶ 21). As planned, Keough returned to work on February 29 and attended a meeting in the morning with Rebecca DeJesus ("DeJesus"), Oxbridge's Comptroller, and Lisa Rojas ("Rojas"), its Assistant Comptroller, to discuss job goals. (*Id.* at ¶ 23). That same morning, however, "Keough received a call from his wife that she was bleeding" and had been directed by her obstetrician to go to the emergency room. (*Id.*). At the hospital, Johana tested positive for fetal fibronectin and doctors determined that she had a "high probability" of delivering the baby prematurely. (*Id.*). Her physician advised her that she would need to remain in the hospital until her expected due date, July 3, 2016. (*Id.*).

According the Complaint, Keough "immediately notified Oxbridge of the developments relating to his wife's pregnancy and left the workplace for the hospital." (*Id.* at ¶ 24). In all, he had returned to Oxbridge for "only a few hours" before purportedly "resuming continuous

FMLA leave." (*Id.*). Moreover, Keough never prepared or submitted paperwork "terminating the continuous leave and commencing intermittent leave." (*Id.*).

In spite of this, Oxbridge – having reactivated Keough's work email address in anticipation of his February 29 return – kept his email address active and Keough soon began to receive a number of "work-related emails." (*Id.* at ¶ 25). In particular, on March 4, 2016, DeJesus sent a request that Keough come to work for a meeting with her and Robert Parsons ("Parsons"), Oxbridge's CEO, on March 7 or 8, which, DeJesus said, would last "an hour and a half tops." (*Id.* at ¶ 26).

Keough attended the meeting on March 7 and also performed other job-related assignments that day, remaining at the office for a total of four hours. (*Id.* at ¶ 27). During the meeting, Keough informed Parsons that due to being on FMLA leave to care for his wife, he would not be "able to come into the office to answer phone calls and e-mails." (*Id.* at ¶ 28). Parsons purportedly responded with a proposal that, in the future, Keough work remotely, for which Parsons would "figure out" "fair" compensation. (*Id.*). Keough verbally accepted the proposal. (*Id.* at ¶ 29). Based on this understanding, Keough began answering work emails while on FMLA leave, although Oxbridge never compensated him for work performed during that time or credited it against his twelve week leave period. (*Id.*). Also at the March 7 meeting, Keough informed Parsons, DeJesus, and Rojas that he had applied for a position with the Jefferson County Sherriff's Department in Golden, Colorado and was expecting to receive a job offer therefrom. (*Id.* at ¶ 30). He thus gave notice that he would remain at his Oxbridge job until July 1, 2016. (*Id.*). Allegedly, at Keough's request, Parsons promised to provide him with a positive job reference. (*Id.*).

Next, between March 7 and 8, Keough had an email exchange with DeJesus regarding the remote work proposal and Keough's supposed obligation to update Oxbridge staff regarding his planned work schedule. (*Id.* at ¶ 31). DeJesus insisted that even though Keough was out on FMLA leave, the terms of his leave still required him to advise staff about his schedule on a daily basis. (*Id.*). Keough reiterated to DeJesus that he was unable to come in daily but was willing, as discussed, to work remotely. (*Id.*). DeJesus replied that, having spoken to Parsons, Oxbridge did not "see that as currently possible" and so Keough should "not begin working from home until [DeJesus] let [him] know what [she and Parsons] have determined." (*Id.* at ¶ 32).

On March 8, 2016, DeJesus texted Keough on his personal phone, directing him to check his email regarding a work-related issue. (*Id.* at ¶ 35). That same day, Nace-Perez – like DeJesus the day before – "chided" Keough for failing to update her and DeJesus about whether he intended to come into the office the next day. (*Id.* at ¶ 36). Keough responded that, although he had originally intended to return to work on a regular basis on February 29, that was no longer possible due to his wife's need for constant care until she had a "more stable prognosis." (*Id.*). However, Keough advised Nace-Perez that, while he remained on FMLA leave, he would continue to answer emails remotely. (*Id.*). Two days later, on March 10, DeJesus included Keough on an email thread about a tuition collection issue, to which Keough responded that he was "available to assist remotely" if supplied with certain relevant information. (*Id.* at ¶ 37). Parsons replied to Keough that the work would be reassigned to a different staff member in order to "respect" Keough's "situation." (*Id.*).

On or about April 6, 2016, Keough asked Nace-Perez about his "rights" once he had exhausted his FMLA leave time and whether, at that point, he would be required to resign if he was unable to return to work. (*Id.* at ¶ 40). Nace-Perez responded on April 8 that Oxbridge

anticipated Keough would work until his announced date of resignation – July 1 – but that if he could not return, Oxbridge would "consider the next option." (*Id.* at ¶ 41). Three days later, on April 11, Keough notified Nace-Perez that, because of his wife's condition and the need to care for his son, he would not be able to return to work full-time once his FMLA leave time expired. (*Id.* at ¶ 42). Keough offered an alternative solution, whereby he would work at the office while his son was at school and thereafter work the rest of the day from home. (*Id.*). He indicated, however, that "in order for me to return, I would need Oxbridge to compensate me as a salary employee with full 80 hour paycheck every 2 weeks. I would also need some assurance that I would be employed through the end of June." (*Id.*). According to the Complaint, "Keough did not mean that he expected to be paid a full time salary for part time work, but rather that he expected to be paid for working remotely on the same basis as working in office because Parsons had not made good on his promise to 'figure out something that is fair' for the work he had done between February 29 and March 10." (*Id.*). The next day, Nace-Perez replied that Oxbridge refused to pay Keough for hours not worked. (*Id.* at ¶ 43). Further, because Keough acknowledged that he did not plan to return to the office full-time, Nace-Perez stated that Oxbridge "accepts your resignation upon the expiration of your leave, April 21, 2016." (*Id.*). Keough attempted to clarify to Nace-Perez that he was merely "reaching out" to reach an agreement about how to handle his transition out of Oxbridge, but neither she, nor any other Oxbridge employee, responded. (*Id.* at ¶ 44).

Shortly thereafter, on April 15, 2016, Johana gave birth prematurely to a son. (*Id.* at ¶ 45). As a result, Keough contends, he would at that point have been able to return to work – prior to the expiration of his FMLSA leave – if granted accommodations similar to what other Oxbridge employees with children received. (*Id.* at ¶ 46). Instead, on April 19, 2016, "hours

short of Keough's FMLA leave expiring," Oxbridge announced the hiring of Keough's replacement, "effective immediately." (*Id.* at ¶ 47).

Upon learning that he had already been replaced, Keough emailed Parsons, asserting that he had been "forced out of his position" for taking FMLA leave. (*Id.* at ¶ 48). He also complained that he never received the "detailed reference" that Parsons had allegedly promised at the March 7 meeting. (*Id.*). Parsons responded that Oxbridge replaced Keough when he advised Nace-Perez that he would only return if Oxbridge agreed to pay him at a full-time rate for part-time work, thereby "effectively resigning" as of "that date." (*Id.* at ¶ 49). In addition, Parsons denied promising Keough a positive reference and claimed that Oxbridge's policy was to provide a prospective employer only with an employee's employment dates and title. (*Id.* at ¶ 50). Keough contested both of these points in a reply message (*id.* at ¶¶ 51-52), but Parsons did not engage Keough further (*id.* at ¶ 53).

On April 21, 2016, Nace-Perez emailed Keough to offer him a severance package of $1,700 in exchange for a release of claims against Oxbridge. (*Id.* at ¶ 53). Keough refused to sign the release or accept the severance package. (*Id.*).

Keough filed a complaint against Oxbridge on August 24, 2016. (DE 1). The complaint was amended once, on October 20, 2016, to add a fully ripened claim. (DE 22). The Amended Complaint ("Complaint") states four counts against Oxbridge (*id.*), one of which – for tortious interference with a business relationship – Keough voluntarily dismissed while this Motion was being briefed (DE 32). Of the three remaining counts, two assert claims under the FMLA: (1) for interfering with Keough's exercise of his FMLA rights, 29 U.S.C. § 2615(a)(1) (Compl. at ¶¶ 54-58); and (2) for retaliating against Keough for having exercised those FMLA rights, 29 U.S.C. § 2615(a)(2) (*id.* at ¶¶ 59-63). Count III alleges that Oxbridge discriminated against

Keough under the Americans with Disabilities Act of 1990 ("ADA") by virtue of his association with his disabled wife and sons, 42 U.S.C. 12112(b)(4). (*Id.* at ¶¶ 64-70). Oxbridge moves to dismiss Keough's claims against it pursuant to Fed. R. Civ. P. 12(b)(6). (DE 28 at 3).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F. 2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe plaintiff's complaint in the light most favorable to plaintiff and take the factual allegations stated therein as true. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purpose of determining whether a claim is legally sufficient).

Generally, a plaintiff is not required to detail all the facts upon which he bases his claim. Fed. R. Civ. P. 8(a)(2). Rather, Rule 8(a)(2) requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds. *Twombly*, 550 U.S. at 555-56. However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 556 n.3. Plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). "Factual allegations must be enough to raise [plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Id.*

## DISCUSSION

### A. *FMLA Claims*

Oxbridge's first ground for dismissal takes issue not with any particular component of either FMLA claim, but rather with the relationship between the two. Specifically, it notes that the interference claim focuses on Oxbridge's failure to restore Keough to his position, while the retaliation claim faults Oxbridge for terminating him. In Oxbridge's view, these counts merely restate the same grievance in different terms: the circumstances under which Keough lost his employment at Oxbridge. Because, the argument continues, courts look past the manner in which a claim is labeled, Keough's retaliation claim should be dismissed. Keough responds that he has satisfied the necessary prongs to state a claim under either theory. In addition, he cites to factual allegations connected to his interference claim that are independent of the retaliation claim.

I agree with Keough that his two theories are legally and factually distinct. First, the standards of proof for FMLA retaliation and interference are different. *Russell v. N. Broward*

*Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003); *accord. Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). The difference is that "[i]n an interference claim the employee must show only that he or she was entitled to the benefit denied" whereas "with a retaliation claim the employee faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Russell*, 346 F.3d at 1340 (internal quotations omitted). Thus, even assuming the underlying harms alleged in each count are identical, Keough would still need to prove additional facts regarding Oxbridge's intent to succeed on his retaliation claim. That makes the two theories of recovery conceptually separate. *See Poe v. John Deere Co.*, 695 F.2d 1103, 1106 (8th Cir. 1982) ("For purposes of determining whether a plaintiff presents two separate claims, we have looked to whether or not proof of the same facts will support both actions . . ."). Further, there is a difference between not restoring an employee to a position when his leave benefits expire and preemptively terminating him while the leave is ongoing. *Cf. Dixon v. Pub. Health Trust of Dade Cty.*, 567 F. App'x 822, 826 (11th Cir. 2014) (". . . if [plaintiff] was terminated *after she received twelve weeks of leave* . . . none of her four FMLA claims are viable") (emphasis added); *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 506-07 (6th Cir. 2006) (". . . an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work *at the conclusion* of the 12-week period of statutory leave") (emphasis added).

Second, although it is true that for both claims Keough highlights the loss of his job (Compl. at ¶¶ 55.b, 60.a), each theory of recovery posits additional – and non-overlapping – factual predicates for its respective claim. For interference, Keough also cites as a basis for that claim Oxbridge's "demanding that Keough perform job duties – including attending a meeting

and responding to phone calls and emails – without either compensation or credit toward his twelve work week entitlement while Keough was on FMLA leave." (*Id.* at ¶ 55.a). For retaliation, he separately references Parsons' refusal to provide him with a job reference. (*Id.* at ¶ 60.b). In reply, Oxbridge disputes the factual circumstances and legal significance of these additional facts. But regardless of the merits of Keough's additional allegations, their very presence makes the interference and retaliation claims distinguishable. Dismissing the retaliation claim on this ground is therefore not appropriate.

Oxbridge's remaining arguments on the FMLA counts address each claim on its own terms. I therefore consider the issues concerning interference and retaliation separately.

### 1. Interference

The Complaint claims that Oxbridge interfered with Keough's exercise of FMLA leave by demanding that he perform job duties while on leave (Compl. at ¶ 55.a) and by failing to restore him to his position or an equivalent through the date of his planned resignation (*id.* at ¶ 55.b). Oxbridge submits that neither the alleged job demands it imposed on Keough while on leave nor its alleged failure to restore his position once he tried to negotiate a return constitute interference under the FMLA. I need not consider the second question because, on the facts alleged,[1] Oxbridge's requirement that Keough perform job duties while on leave states a valid claim for relief.

---

[1] Oxbridge requests that the Court take judicial notice of documents and email exchanges attached as exhibits to the instant Motion. Oxbridge is correct that the Court may consider documents appended to a motion to dismiss where "a plaintiff refers to [it] in its complaint, the document is central to its claims, [and] its contents are not in dispute . . . ." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). I also concur with Oxbridge that such a situation is, for the most part, applicable here, and therefore take notice of the majority of attached exhibits. I do not take notice of Exhibit J, which incorporates an email exchange not referenced in the Complaint. But even those documents that I do entertain do not appear to contradict any of the Complaint's allegations. Indeed, they demonstrate that Keough has

The FMLA (the "Act") proscribes efforts by employers "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1). The Act created two central rights: first, to make employees eligible for "12 workweeks of leave during any 12-month period" for qualifying reasons related the employee's or a family member's health;[2] and (2) the "right following leave to be restored by the employer to the position of employment held by the employee when the leave commenced or to an equivalent position." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (quoting 29 U.S.C. § 2612(a)(1) and § 2614(a)(1)) (internal quotations and alterations omitted).

In order to establish that his employer interfered with one of these rights, "an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA", *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008), and that he has been prejudiced thereby, *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). Oxbridge does not argue that Keough was not entitled to FMLA benefits, only that he was never denied them or prejudiced by any theoretical denial. As an initial matter, Oxbridge claims the Complaint admits (and its own exhibits confirm) that it only requested – never demanded – that Keough appear at work for a meeting on March 7 or 8. In its view, work related communications cannot rise to the level of interference if not framed as commands. Oxbridge maintains further that it paid Keough for the

---

accurately quoted language from a number of email exchanges. Where referenced, none of the exhibits disprove Keough's claims or necessarily confirm the inferences that Oxbridge draws therefrom. *See infra.*
[2] In this case, the qualifying reason that Keough requested leave was "[i]n order to care for [his] spouse, or a son, daughter, or parent . . . if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).

four hours he spent at work the day of the meeting, thus implicitly challenging the prejudice prong.

Neither of these objections is compelling. To begin with, the Complaint alleges that Oxbridge officials mandated Keough engage in several tasks, in addition to the meeting request. These include "direct[ing] him to take phone calls and answer e-mails from the delinquent parents" once at the school (Compl. at ¶ 27); texting him on his cell phone to "check email" and "use memorized transactions for Gatorade" (*id*. at ¶ 35); and insisting that he update staff on a daily basis regarding his planned work schedule (*id*. at ¶¶ 31, 36).

More importantly, both compulsory and nominally voluntary work assignments can violate the FMLA. What the Act prohibits is "'interfering with' the exercise of an employee's rights under the FMLA" so as to "'discourag[e] an employee from using FMLA leave.'" *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (quoting 29 C.F.R. § 825.220(b)) (internal alterations omitted). Several circuits, the Eleventh included, agree that an employer discourages workers from taking leave when it "require[s] an employee to perform work during FMLA leave." *Simmons v. Indian River Mental Health Ctr.*, 652 F. App'x 809, 818 (11th Cir. 2016); *accord. Massey-Diez v. Univ. of Iowa Comty. Med. Serv., Inc.*, 826 F.3d 1149, 1159 (8th Cir. 2016); *O'Donnell v. Passport Health Commc'n, Inc.*, 561 F. App'x 212, 218 (3d Cir. 2014); *Sabourin v. Univ. of Utah*, 676 F.3d 950, 961 (10th Cir. 2012); *see also Arban*, 345 F.3d at 402 (implying same).[3] But overly aggressive requests can also amount to work requirements, *Sabourin*, 676 F.3d at 961 ("[t]here will undoubtedly be occasions when . . . the request may

---

[3] Whether work assignments are "material" and burdensome, or merely "*de minimus* contacts" containing "discrete inquiries" is a question of fact. *See O'Donnell*, 561 F. App'x at 218 (distinguishing between the two categories and deciding issue with reference to case-specific facts); *Massey-Diez*, 826 F.3d at 1158-59 (same); *Sabourin*, 676 F.3d at 961 (same). For this reason, I reject Oxbridge's unsupported contention in its Reply that the catalogue of tasks Keough performed during FMLA leave was not actionable as a matter of law.

simply be unreasonably burdensome"), just as outright demands will sometimes be considered *de minimus*, *see, e.g.*, *O'Donnell*, 561 F. App'x at 218 (noting that "'there is no right in the FMLA to be 'left alone,' and be completely absolved of responding to the employer's discrete inquiries") (quoting *Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3d Cir. 2005)). Thus, in *Arban v. West Publishing*, the Sixth Circuit upheld a jury's finding that an employer interfered with the plaintiff employee's exercise of FMLA rights when it "*asked* [plaintiff] to continue to perform work-related tasks while ostensibly on medical leave," and a supervisor left several calls "*request[ing]* that he provide customer lists and pending sales," and drive to a mutually convenient location for a meeting. *Arban*, 345 F.3d at 402 (emphasis added). The Complaint's allegations, viewed in the light most favorable to Keough, state a claim that Oxbridge's work-related assignments – both mandatory and discretionary – interfered with the exercise of his FMLA rights.

Oxbridge's assertion that it paid Keough for the time he spent in the office is irrelevant for several reasons. First, it does not take account of Keough's claim that, while on leave, he performed other duties over a week-and-a-half period for which he was not paid. (Compl. ¶¶ 42, 55). Second, Keough pled that Oxbridge did not pay him for *any* time worked during leave. (*Id.* at ¶ 29). Oxbridge's citation to an allegedly contradictory email exchange between Keough and Nace-Perez (DE 28-10) cannot be credited at this stage because Keough did not reference it in his Complaint. *See supra*, n. 1. Third, the Eleventh Circuit has held that the unavailability of monetary damages is not decisive in interference claims because the FMLA permits equitable relief, the provision of which is within the district court's discretion. *Evans*, 762 F.3d at 1296 (quoting 29 U.S.C. § 2617(a)(1)(A) and (2)).

Separately, Oxbridge disputes whether Keough was even on continuous leave during the period that he allegedly performed work. Were Keough, as Oxbridge claims, actually taking leave on an intermittent basis beginning February 29, he could immunize himself only from such work that was assigned during a discrete "block[] of time" for which he had given adequate notice of taking leave. *See* 29 C.F.R. 825.202(a) (defining intermittent leave); *Peeples v. Coastal Office Prod., Inc.*, 64 F. App'x 860, 863 (4th Cir. 2003) (noting that the "employer's duty to provide leave is triggered" only upon "adequate and timely notice of the need for covered leave") (internal quotations omitted). No one disputes that Keough never sought leave for a discrete block of time while otherwise working regular hours. The conflict concerns whether Keough resumed continuous leave once his wife was sent to the hospital on February 29, 2016. Oxbridge implies that, in order to allege as much, Keough had to plead that he explicitly informed Oxbridge by March 4 of this intent. In response, Keough reiterates the Complaint's allegation that he returned to continuous FMLA leave on February 29.

Neither the text of the FMLA nor its enforcing regulations explain what an employee must do in order to convert intermittent leave into continuous leave or vice versa.[4] But the regulations say enough to infer the procedure for notifying an employer of his intent to resume leave after the employee has returned to work for an interim period. The regulations expound on the issue of notice, addressing in particular what to do when the reason for leave is unforeseeable. Whether leave is continuous or intermittent, the employee is generally required

---

[4] The statute simply provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" for qualifying reasons. 29 U.S.C. § 2612(a)(1). It also permits employees who, as is the case here, must care for a close family member with a "serious health condition" to take leave on an intermittent basis. 29 U.S.C. §§ 2612(a)(1)(C) and (b)(1). Finally, for the type of care at issue, employees must provide employers with at least thirty days' notice of their intent to take leave when the treatment necessitating care is "foreseeable." 29 U.S.C. 2612(e)(2)(B).

to provide notice only once, *id.*; *see also Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 350-51 (6th Cir. 2008) (holding that employee must give notice of intermittent leave only once as long as all blocks of such leave occur within the same 12-month period), but thereafter "shall advise the employer *as soon as practicable* if dates of scheduled leave *change or are extended*, or were initially unknown." 29 C.F.R. § 825.302(a) (emphasis added); *see also* 29 C.F.R. § 825.302(a) (requiring notice as soon as practicable in unforeseeable situations). Practicality is a question of fact that turns on the "circumstances in the individual case." 29 C.F.R. § 825.302(b); *Hopson v. Quitman Cty. Hosp. & Nursing Home, Inc.*, 126 F.3d 635, 640 (5th Cir. 1997).[5] When the employee contacts his employer, he is usually not obligated to "expressly assert rights under the FMLA." 29 C.F.R. § 825.302(c). It is enough to supply information "sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason." *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997); *see also Nicholson v. Pulte Home Corp.*, 690 F.3d 819 (7th Cir. 2012) (employee seeking leave to care for family member need not "specifically refer to the FMLA so long as she alerted her employer to the seriousness of the health condition" and "indicate[d]" that leave pertained to caring for family member) (internal quotations and alterations omitted). However, if the employee previously sought and was granted FMLA leave, an additional leave request premised on the same reason "must specifically reference the qualifying reason for leave or the need for FMLA leave." 29 C.F.R. § 825.302(c). In those situations, the employer should reciprocate by "inquir[ing] further of the employee" regarding "necessary details" of the proposed leave. *Id.*

---

[5] The regulations stipulate, however, that it should ordinarily be practicable for an employee to provide notice of an unforeseen need for leave "either the same day or the next business day." 29 C.F.R. 825.302(b). In a similar vein, "absent unusual circumstance," an employer can require employees to follow a "usual and customary" notice procedure. 29 C.F.R. 825.302(d); *see also Srounder v. Dana Light Axie Mfg., LLC*, 725 F.3d 608, 615 (2013).

Keough alleges that his wife had an emergency medical situation.  This event can reasonably be inferred to create an unforeseeable circumstance such that Keough's leave dates needed to be "change[d] or extended."  29 C.F.R. § 825.302(a).  Accordingly, Keough was required to provide notice as soon as practicable of his intent to resume leave on a continuous basis.  *Id.*  I find that that the Complaint's allegations state a plausible claim that Keough provided sufficient notice to Oxbridge.  Keough claims that the very day he returned to work he "immediately notified Oxbridge of the [emergency] developments relating to his wife's pregnancy." (Compl. at ¶ 24).  He also allegedly informed Parsons one week later that he would be unable to come into the office because he was on leave.  (*Id.* at ¶ 28).  Keough had a similar conversation with Nace-Perez by email the next day.  (*Id.* at ¶ 36).  Because the Complaint plausibly supports the proposition that Keough was still on continuous leave when Oxbridge began to make work-related demands, Keough's interference claim cannot be dismissed.

### 2. Retaliation

Keough claims that Oxbridge retaliated against him for taking FMLA leave by terminating his position prior to the expiration of his leave (Compl. at ¶ 60.a) and by Parson's refusal to provide him with a detailed personal reference for a prospective employer (*id.* at ¶ 60.b).  To make out a prima facie case of retaliation under the FMLA, a plaintiff "must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity."  *Strickland*, 239 F.3d at 1207.  Oxbridge argues that neither of the employment decisions that the Complaint cites are "adverse" within the meaning of the Act.

The FMLA borrows Title VII's standard for determining whether an employment action is adverse.  *See Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000)

("When evaluating a claim of retaliation under the FMLA . . . we apply the burden-shifting framework established . . . in *McDonnell Douglass* . . . for evaluating Title VII retaliatory discharge claims."). Title VII, in turn, demands that an employee "show a serious and material change in the terms, condition, or privileges of employment" from the perspective of "a reasonable person in the circumstances." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239-40 (11th Cir. 2001). The "asserted impact" need not necessarily involve "direct economic consequences in all cases," but it "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* at 1939.

Oxbridge of course does not deny that a termination would be an objectively serious and material change in Keough's terms and conditions of employment. *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) ("It is undisputed that [plaintiff's] termination constitutes an adverse action."). Rather, it advances the theory that Keough was never terminated. Doubling down on Nace-Perez's characterization of Keough's April 11, 2016 email, Oxbridge maintains that Keough actually resigned. Nowhere in the Complaint did Keough allege that he resigned.[6] In fact, he specifically anticipated and attempted to refute that notion. (Compl. at ¶¶ 42-44). The Complaint alleges that Keough was terminated during his FMLA leave, and thus, that he suffered an adverse employment action. Since Oxbridge does not offer a valid critique of this aspect of the Complaint, Keough's allegation that Oxbridge terminated him

---

[6] Oxbridge asks the Court to construe Keough's April 11 email as a resignation. There are no grounds to do so. Although I have taken judicial notice of the pertinent email, the word "resign" or "resignation" does not appear in Keough's message. (DE 28-2, Ex. B). Neither does Oxbridge offer authority for its implied theory that the content amounts, as a matter of law, to some sort of "constructive resignation." And to the extent Oxbridge would have the Court interpret the email as such as a factual matter, that conclusion is not warranted. At the motion to dismiss stage, courts "view facts in the light most favorable for the plaintiff[]." *Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998). I need only find – as I do – that Keough's allegation that he sought only a scheduling accommodation to allow for full-time work is "plausible on its face." *Am. Dental Ass'n.*, 605 F.3d at 1289.

in violation of the FMLA satisfies the adverse action prong of a retaliation claim.[7]  Dismissal of this count is denied.

### B. ADA Claim

Keough's third count claims that Oxbridge committed associational discrimination under Title I of the ADA when it terminated him.  That is purportedly because Oxbridge was displeased that the disabilities of Keough's wife and sons would require him to work from home. (Compl. at ¶ 66).  The ADA permits claims premised on a form of discrimination that targets individuals because of their relationship with disabled relatives.  42 U.S.C. § 12112(b)(4); *Hilburn v. Murata Elec. North America, Inc.*, 181 F.3d 1220, 1230-31 (11th Cir. 1999); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242-1243 (11th Cir. 2001).  When making such a claim, a plaintiff must allege that "(1) she was subjected to an adverse employment action, (2) she was qualified for the job at that time, (3) she was known by [the employer] at the time to have a relative with a disability, and (4) the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [the employer's] decision." *Hilburn*, 181 F.3d at 1230-31.  Oxbridge challenges only the first and fourth factors.

As to the first factor, Oxbridge repurposes its argument, rejected above, that Keough was never terminated, but instead resigned.  I reject that argument here for the same reasons previously discussed. *See Howard*, 605 F.3d at 1244.  Keough has sufficiently pled that he was subject to an adverse employment action.

---

[7] As a result, I do not need to reach the second question concerning whether a generic and neutral, as opposed to detailed and positive, job reference may be adverse.  In turn, I decline to address the dependent issue of whether Keough adequately pled a causal link between the absence of a job reference and a prospective employer's failure to hire.

More substantively, Oxbridge attacks Keough's allegations as lacking the requisite causal link between the adverse action and the relevant disabilities so as to implicate the "determining factor" prong.  As a threshold matter, Oxbridge argues that, under the ADA, a plaintiff must plead that the disability at issue was the "but-for" cause of the adverse employment action.  According to Oxbridge, because Keough alleged in a separate count that his termination was due to his exercise of FMLA rights – not his association with disabled relatives – he has essentially pled that Oxbridge had mixed motives.  In turn, the argument continues, his family members' disabilities could not – as a matter of law – have been the but-for cause of his discharge.  In support, Oxbridge cites two circuits that have embraced "but-for" causation as the governing standard for ADA claims.  *See Lewis v. Humbolt*, 681 F.3d 312, 318 (6th Cir. 2012); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010).

I note first that the language of *Hilburn* states that associational claims need only adduce a "reasonable inference that the disability was a determining factor", *Hilburn*, 181 F.3d at 1231, which is potentially a doctrinal deviation from the statutory "because of" phrasing from which the "but-for" standard derives, 42 U.S.C. § 12112(a).  Were that the case, there would certainly be no problem with pleading mixed motives.  Furthermore, I doubt whether the ADA and FMLA retaliation counts allege distinct factual motives.  They appear to be merely different legal conclusions drawn from the same motive.  However, for present purposes, I assume that the standard for pleading causation on an associational discrimination claim must mirror that for a regular ADA claim and that the two relevant counts introduce separate motives.

The opinions to which Oxbridge alludes followed in the wake of the Supreme Court decision in *Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167 (2009), which adopted a more rigorous causation standard for ADEA claims.  *See also Univ. of Texas Southwestern Med. Ctr. v. Nassar*,

19

133 S. Ct. 2517 (2013) (expanding doctrine to Title VII). In the Eleventh Circuit, the ADA's causation standard remains somewhat unsettled. Prior to *Gross*, this Circuit accepted that the "prohibited motivation" for an ADA violation must "make[] the difference in the employer's decision, *i.e.*, [be] a 'but-for' cause." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1076 (11th Cir. 1996). At the same time, *McNely* stressed that but-for causation "does *not* mean solely because of," but rather that the impermissible motivation be one factor without which the adverse action would not have occurred. *Id.* (emphasis in original) (internal quotations omitted). Essentially, that case reconciled "but-for" and "mixed-motive" frameworks. Until recently, at least some district courts in this Circuit believed that the *McNely* rule was dead and buried. In particular, Judge William Acker, Jr. wrote that, in light of *Gross* and *Nassar*, the ADA did not permit mixed-motive claims and therefore *McNely* had been abrogated. *Savage v. Secure First Credit Union*, 107 F. Supp. 3d 1212, 1216-17 (N.D. Ala. 2015). That holding led him to dismiss an ADA count, the causation theory for which was intertwined with other claims. *Id.* at 1217. In a terse, unpublished opinion issued just last year, the Eleventh Circuit reversed the district court in *Savage*, concluding that the lower court's finding was inconsistent with the federal rules' tolerance of alternative and inconsistent claims. *Savage v. Secure First Credit Union*, No. 15-12704, 2016 WL 2997171, at *1 (11th Cir. May 25, 2016) (unpublished). *Savage* suggests that, however endangered *McNely*'s interpretation of "but-for" causation might be at the summary judgment phase or later, ADA plaintiffs are still allowed to plead that a single adverse action stemmed from both disability and non-disability-related sources. Accordingly, the Complaint's assertion of two motives for Keough's termination does not warrant dismissal of the associational discrimination claim.

Taking aim at the Complaint's specific allegations, Oxbridge also argues that Keough does not introduce any facts that would support the school's supposed motivation – whatever the causation standard. To the contrary, I find that the timing between Keough's alleged attempt to negotiate a modified work schedule and Nace-Perez's email terminating him permits a reasonable inference that Oxbridge decided to discharge Keough because of the constraints that his wife and sons' care requirements imposed on him.

Finally, Oxbridge asserts that it could not have held a discriminatory impulse at the time of discharge because it had been aware of Keough's older son's disability throughout his two-and-a-half year employment, and never took any adverse action prior to Keough's leave. But this reasoning ignores the Complaint's allegations that it was the circumstances of Johana's pregnancy and Keough's resultant FMLA leave which induced Oxbridge to discriminate. Since Oxbridge has not demonstrated that Keough fails to satisfy the elements of a prima facie associational discrimination claim, there is no ground to dismiss the ADA count.

Accordingly, it is **ORDERED** and **ADJUDGED** that Defendant Oxbridge Academy Foundation, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint (DE 28) is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this _9_ day of February, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc:    Counsel of Record